## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Durwin Ellerman, being duly sworn, depose and state as follows:

1.      I am currently a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). I was deputized as a federal TFO pursuant to 21 U.S.C. § 878 on September 27, 2023, and I am designated by the Attorney General, through approved delegations of authority, to execute and serve search warrants and arrest warrants issued under the authority of the United States. Accordingly, I am serving as a "federal law enforcement officer" as defined in Federal Rule of Criminal Procedure 41(a)(2)(C). Prior to working as a full-time DEA TFO, I was assigned as a Detective at the Burlington, Vermont Police Department (BPD) since November of 2019. I have been a certified full-time law enforcement officer with BPD since May of 2014.

2.      Throughout my assignments, I have investigated or assisted with the investigation of numerous illegal drugs, drug-related devices/paraphernalia and drug-related evidence. I have seized or participated in seizures of different quantities of illegal drugs, controlled substances, user paraphernalia and other assorted items, such as money and property related to or acquired through the drug trade. I have seized or participated in seizures of various types of illegal drugs/narcotics during these investigations, to include powder cocaine, cocaine base, marijuana, heroin, fentanyl, methamphetamine, and numerous types of prescription medications. I have conducted or been involved in multiple drug investigations, and from this experience I am familiar with the trends associated with the use and distribution of illegal drugs/controlled substances. I have conducted frequent controlled purchases of illegal substances utilizing confidential sources. I have also participated in specialized training in which the primary focus was proactive criminal drug enforcement provided by the Vermont Criminal Justice Training Council. This training taught me interdiction techniques and to identify criminal drug activities.

3.      I submit this affidavit to establish probable cause to believe that on October 24, 2025, in the District of Vermont, Brandon FIELDS violated 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) by knowingly and intentionally possessing with intent to distribute a mixture and substance containing cocaine base and, in or about October 2025, in the District of Vermont, FIELDS violated 18 U.S.C. § 2261A(2)(B) by cyberstalking – that is, with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, using a facility of interstate commerce to engage in a course of conduct causing, attempting to cause, or reasonably expected to cause substantial emotional distress to that person.

4.      This affidavit is based upon my training and experience, and the investigation of other law enforcement officers and my own observations and participation in this investigation. This affidavit is submitted for the limited purpose of establishing probable cause, therefore, I have not set forth each and every fact learned by law enforcement during the course of the investigation. Where I describe a statement, it is described in substance, not verbatim.

**Initial Response**

5.      On October 9, 2025, at approximately 19:50 hours, the Burlington Police Department received a call from A.C. requesting a welfare check on her daughter, S.C. Per the dispatch narrative in the incident, A.C. had not heard from her daughter in a number of days, which was highly unusual. A.C. further indicated to dispatchers that her daughter had alluded in the past to domestic issues with her boyfriend, Brandon FIELDS.

6.      Ofc. Chun and Cpl. Congdon of the Burlington Police Department (BPD) were assigned to the initial welfare check as the initial responding patrol units. Ofc. Chun wrote the following report in the Burlington Police Department incident:

> a.  *On the above date and time, I talked to [S.C.], her roommate, and her friends at her apartment located at 16 S Willard St.*

2

b. *[S.C.] said that her ex-boyfriend, Brandon Fields, has been listening to her conversations over her phone, stalking her. She was emotionally distressed to the point where she seemed highly paranoid. For instance, when I asked her where her phone was, she said she had put it in her bathroom behind closed door, because she did not want him listening to her. I asked her how he was harassing her, she showed me a string of text messages. The sender was threatening her with legal actions, and seemed to be emotionally manipulative in nature. I told her to send screenshots of all the texts she have received from him. I gave her my business card. I later received those screenshots and I have attached them to this incident.*

c. *She was very paranoid, so we told her that she needed to take a deep breath, as Officer Congdon and I thought it was highly unlikely that Fields tapped into her Apple Iphone. One of her roommates then showed us a text that indicated Fields knew that police officers were at [S.C.'s] apartment. We told her that this did not indicate that he hacked into her phone as we had cruisers with blue lights on in front of her apartment. We pointed out that, for instance, he could be nearby, observing.*

d. *As [S.C.] remained paranoid and emotionally distressed, Officer Congdon offered to look for possible listening or surveillance device in [S.C.'s] apartment. [S.C.] and her roommate gave us consent to search their apartment for surveillance devices. We did not find any. Officer Congdon also looked at her car, but did not find anything suspicious.*

e. *I gave [S.C.] the after hours TRO phone number and connected her with a CSL Mitchell, who came out and helped her apply for a TRO against Fields. I told [S.C.] that with the TRO in place, we would be able to take action if Fields were to attempt to make contact with her again.*

f. *I told [S.C.] and her roommates to call 911 if Fields attempts to gain access into her apartment. We advised her to change her passwords and the door lock key codes. I told [S.C.] to stay with her roommates and to call me if she has any questions.*

g. *I left [S.C.] with CSL Mitchell.*

h. *I later received screenshots of text messages [S.C.] had received from Fields. I was also informed that Fields had added a surveillance app on [S.C.'s] phone (AudioFetch) and was listening to her through her own phone. [S.C.] stated that Fields had also put his own information in [S.C.'s] Apple ID. Given all this new*

information, I had probable cause to believe that Fields has committed and was committing the [State of Vermont] crime of stalking.

i.  I later called [S.C.] to obtain her sworn verbal statement. I was informed by [S.C.]that she was at a court hearing with Fields and that her request to have a permanent Restraining Order had been denied. She said the court gave Fields a protection order against her instead. She was clearly distressed by this turn of events. I asked her if she would give me a sworn verbal statement, but she was hesitant to do so, as she feared that Fields would retaliate with more intensity. I told her to think about it and that I would call again. As she was emotionally distraught, I thought it would be helpful for my investigation to allow her to collect herself before obtaining a sworn verbal statement.

j.  She informed me during our conversation that Fields came by her house after the court hearing to further intimidate her. She said she was very concerned about her safety. She also said that while she was closing the restaurant she was working for by herself, he showed up to harass her. She stated that when she went to her car that was parked at a nearby parking garage, she saw him loitering about, standing by a street traffic sign outside the parking lot within her path of travel. She was very emotionally distraught and expressed intense fear for her safety. She informed me that a third party told her that Fields was hiding in the parking lot of her residence the day Officer Congdon and I responded there. According to [S.C.], Fields notified this third party of this and this third party individual informed [S.C.].

k.  I called [S.C.] again on 10/18/2025, and this time, [S.C.] asked if she could call her mother, [A.C.] to join our conversation. I said this was fine. [A.C.] was also very concerned about [S.C.'s] safety, and they were both worried that if [S.C.] were to give me a sworn verbal statement, Fields would find out and retaliate. They seemed uncertain, so I told them I could let them talk to my supervisor, Sgt. Vivori, who would be able to talk them through the process. They agreed to talk to him, but [S.C.] said she wanted to wait until tomorrow to talk to the OIC. I relayed this to Sgt. Vivori, and he said it would be helpful for [S.C.] to go forward with this charge of stalking as soon as possible given the circumstances. I called [S.C.] back but she did not pick up. I left her a voice message.

l.  I was later informed that Fields had eluded other officers' attempts to serve TRO paperwork on him. See linked incident 25BU028420 for more details.

m.  On 10/19/2025, [S.C.] talked to Sgt. Vivori. [S.C.] later called me and left me a voice message. She agreed to provide a sworn verbal statement.

n.  I have not obtained specific details from [S.C.] as she was not ready to provide me with a sworn verbal statement. Given what she told me so far, however, I have probable cause to believe that Fields has committed and will continue to commit the crime of stalking. I have the following elements of the [State of Vermont] crime of stalking:

o.  1. Fields installed a surveillance app on [S.C.'s] phone to listen to her. He used the information gathered from this point of access to intimidate and harass [S.C.]-- enough to make [S.C.] put her phone in her bathroom behind closed door.

p.  2. Fields, reportedly, was loitering around [S.C.'s] residence at the time of my response there, surveilling her.

q.  3. Fields, after the court hearing, deliberately came by her house to intimidate her, showing her that he was unfazed by the legal proceedings.

r.  4. [S.C.] saw Fields lurking around her place of work . . . when she was alone, closing up the restaurant. She saw him when she was getting into her car parked in a nearby garage. He stood by a traffic sign that was in her path of travel. She said she was so scared at the time that she did not even call the police.

s.  5. [S.C.] has told me that Fields has no respect for the law or legal authority. She said she was very concerned about her safety and she continued to show signs of paranoia, saying that Fields will harass her forever and that this will not stop.

7.  Ofc. Chun received the following texts and screenshots from S.C., showcasing conversations that occurred between she and FIELDS and also showed that an application had been installed to her iPhone device that allowed for FIELDS to listen to her phone calls. These pictures are not presented in chronological order in this criminal complaint:



**Left screen:**

6:27

< 902

🚫 +1 (305) 452-9006 )

Text Message · SMS
Tuesday 9:34 PM

Just turned myself in. Tired of all of this and ready to be sober. Grace cant get to me here. I love you and always will

Ill see you one day. But your best bet is to forget i ever existed

13054529006 Deposited a new message:
"CCN, it's Brandon. Um, just wanted to let you know that. I'm away now. I swan Yeah, I just wanted to let you know that I love you and I'm I'm sorry for what I put you through. Not to lose anything since everything's all out now, I'll be honest, but I never have physically cheated on. I have distracted myself and I have been around. OK OK fine. It's just not who I am. But uh yeah, I. Really really need help. I also haven't really been fully sober this whole relationship and That would tend to happen It's under the influence, so. When you get sober and. Obviously all these things are happening for a reason and I feel like things were actually turning around and I was gonna talk to you about things at some point. I didn't feel like it was the right time with everything going on. I'm sure you don't wanna hear it and then you'll be the same. Just forget I existed, but just know that I love you and I will always love you and We do find happen this Sunday. They are.

**Right screen:**

6:27

< 902

🚫 +1 (305) 452-9006 )

and I feel like things were actually turning around and I was gonna talk to you about things at some point. I didn't feel like it was the right time with everything going on. I'm sure you don't wanna hear it and then you'll be the same. Just forget I existed, but just know that I love you and I will always love you and We do find happen this Sunday. They are really. And she God bless.
Click here: 14699825001 to listen to full voice message.

Yesterday 6:29 PM

Whoever beach towel is needs to take your number down an delete their post, or i am suing your entire house for physical assault, harrassment, slander, libel, and entrapment. My lawyer has already been notified.

Hes already contacted sophia azzaro

Matter of fact tell me who beach towel is or im gonna press charges on all of yall

I actually cooked up such a good comment was gonna flame sophia and stella

I know youre on your phone, if you dont tell me who beach towel is within the next half hour im moving forward w the charges

15 min







8. The AudioFetch application displayed on S.C.'s device allows for users to cast local device audio to other devices over a WiFi or network connection. S.C. has since removed the AudioFetch application from her phone.

9. BPD Victim Advocate Mary McCallister wrote the following brief report in the same incident:

    a. *On 10/10/25 I spoke with [S.C.] who now has a new phone number. She advised that she spoke with Apple who were able to find that an App had been installed on her phone back on June 17th 2024 that transmits audio from her phone to a different listening device. The also told her that his contact info was hidden in her contact info for Apple. She has since had all of that changed and deleted. She no*

*longer is getting contacted by him. She is not sure where he is currently staying and heard that in the past 48 hours he has withdrawn from UVM over a separate issue.*

10.    Through the course of Ofc. Chun's investigation, "Brandon Fields" was positively identified as FIELDS.

11.    On October 23, 2025, at approximately 21:58 hours, the BPD received another call from S.C. In the initial dispatch narrative S.C. indicated that she had received a call from FIELDS's roommate, M.S., stating that he was concerned for S.C.'s welfare because FIELDS had been "making threats to send someone into her work tomorrow to impersonate a legal authority and then when she leaves work [FIELDS] is going to wait in her car with a knife or gun to ambush her."

12.    This second complaint was handled at the patrol level by Ofc. Williamson, who wrote the following report:

a.    *I spoke to [S.C.] on the phone. [S.C.] advised that she had a temporary order out on her ex-boyfriend, Brandon Fields. She said the hearing for the permanent order was on 10/16/25. She said Fields counterfiled for an order against [S.C.], which had the same hearing date and the judge upheld Fields' order and not [S.C.'s]. She said Fields then showed up outside her residence after the hearing and said, "I love you and I forgive you" and then drove off. [S.C.] stated that Fields also showed up at her job . . . in Winooski where she is a bartender. She said Fields knows that she closed the business in the evening and was waiting outside. [S.C.] said she walked past him and got in her car and drove home. She said Fields followed her all the way to the Winooski traffic circle.*

b.    *[S.C.] said she got a call from Fields' roommate, [M.S.]. [M.S.] told her that he overheard Fields talking loudly to people on his phone in his room. [M.S.] said that Fields called 13 people trying to get someone to assist him and apparently the 13th person agreed. Fields was going to have that person go to [S.C.'s] work at the end of her shift and pose as an attorney and scare her into communicating with Fields. [M.S.] also overheard Fields saying he would hide in [S.C.'s] car when she got off of work and that he'd have a knife or a gun. She told me that her car has a door code and that Fields knows the code and she has not changed it yet.*

c.    *I advised [S.C.] that she could call Winooski PD and see if someone was available to standby as she was getting off work. I will also be emailing CSLs to see if they can assist [S.C.] in getting a TRO against Fields. I have not yet reached out to [M.S.] because of the time of day.*

10

13.     On the morning of October 24, 2025, Det. Lt. Beliveau made Det. Beal aware of the call that S.C. had made the previous evening to the BPD about statements passed along to her by M.S. Det. Lt. Beliveau requested that Det. Beal respond to the department to begin investigating further.

14.     Already being familiar with Ofc. Chun's investigative steps in this case, Det. Beal contacted M.S. to discuss the statements that he had passed along to S.C. the previous evening. Det. Beal's conversation with M.S. was recorded on a department landline phone beginning at approximately 10:26 hours. M.S. was sworn to the veracity of his statements at the beginning and end of their conversation. In sum and substance, M.S. stated the following under oath:

a. M.S. stated that he had video evidence of the statements he was about to describe as having heard uttered by Fields. Det. Beal would later clarify this with M.S., who would go on to provide Det. Beal with Blink camera footage taken inside he and Fields' shared 6C Chase Lane, Burlington address in common areas of the residence. [M.S.] stated during their conversation that these cameras were placed out of an abundance of caution owing to previous issues with other tenants, and that Fields had been made aware of the existence of these cameras when he signed his lease.

b. M.S. stated that the issues he had raised to S.C. had been going on for at least one week, citing that he believed the issues had possibly been occurring for two weeks.

c. M.S. stated that he recalled Fields attending a court hearing via Zoom, which he and all the other roommates in the apartment could overhear. M.S. stated that he heard the case had to do with a female named "S.C."

11

d.  According to M.S., since the court hearing Fields had been talking every night on the phone about "targeting" S.C.

e.  M.S. stated that he was aware Fields "had a plan." M.S. stated that he had heard Fields state he knew how to get into S.C.'s vehicle via a keypad, and that he planned to hide in her car while she was at work. He further planned to have his "brother" impersonate a lawyer or law enforcement officer to leverage fake charges against S.C. in an attempt to get her to contact him and reignite their romantic relationship. M.S. further stated that he and his roommates had heard Fields make statements about bringing weapons with him while hiding in S.C.'s vehicle and waiting for her, stating that all of this had been discussed openly in the common areas of the home in what was an apparent attempt for the two to get back together.

f.  M.S. stated that he was able to positively identify "S.C." as S.C. and that, once he had identified her, he contacted her out of concern for her wellbeing.

g.  M.S. stated that during the conversations that Fields was having with his friends over the phone in the common areas of the residence that it appeared as though his friends had been egging him on to follow through on the aforementioned "plan."

h.  M.S. stated that Fields had not made mention of weapons "recently," but that there was a recording of Fields talking to someone about lying in wait within S.C.'s vehicle with a firearm.

i.  M.S. stated that he did not know Fields to own any firearms but that he believed Fields could easily get one because he was a pot dealer who could trade weed for a firearm.

     j.   M.S. stated that he was aware from hearing Fields' conversations that S.C.'s vehicle had a keypad entry, which Fields knew the combination to.

     k.   M.S. stated that a number of Fields' calls that had been recorded by the Blink cameras appeared to involve Fields trying to solicit assistance from his friends to help with his plan to get into S.C.'s vehicle.

15.     M.S. would later send Det. Beal multiple Blink video recordings from inside the 6C Chase Lane residence. In the videos, timestamped from October 17 through October 23, 2025, FIELDS was seen and heard soliciting unknown parties to assist him in threatening S.C. Fields made mention of having a "script" for someone to either call or enter S.C.'s place of employment, where they would pretend to be legal counsel and coerce her into speaking with him. Fields asked during one recording, while discussing lying in wait in S.C.'s vehicle, "What if I had a gun?"

16.     After speaking with M.S., Det. Cpl. Moyer reached out to S.C. to set up an interview. At S.C.'s request, the interview took place in a public location outside of Burlington, specifically at the University Mall in South Burlington. Det. Cpl. Moyer and Det. Beal met with S.C. in the food court of the mall.

17.     This interview with S.C. was recorded on a dedicated audio recording device, as well as on Det. Beal's Axon body camera. S.C. swore to the veracity of her statements at both the beginning and end of their conversation. It should be noted that throughout their conversation, S.C. appeared in fear that FIELDS was actively tracking her location: she repeatedly scanned the crowd to see if he was present in the mall, and made statements that he had tracked her location previously. In sum and substance, S.C. stated the following:

     a.   She and Fields had been involved in a romantic and sexual relationship for approximately 2-2.5 years. On October 7, 2025, she ended their relationship.

13

b.  S.C. also stated that "one hour" after the TRO hearing between the two of them,
    identified as occurring on October 16, 2025, he showed up outside her apartment.
    She stated that he drove past her apartment in a black Chevy Malibu with Florida
    license plates, stating that it was his father's rental vehicle and that his father had
    been in Vermont for the TRO hearing. It should be noted that this was the same
    vehicle that Fields showed up to the Burlington Police Department on October 14,
    2025, to accept service of the TRO that S.C. had filed against him.

c.  S.C. stated that she was last aware of Fields showing up at her place of employment,
    [name of restaurant] in Winooski, on October 17, 2025. S.C. would go on to say
    that she was responsible for closing the business on Friday nights and that, when
    she exited after closing, she saw Fields standing on the side of the road. She
    approached her vehicle, and Fields followed her. When Fields stopped her vehicle
    at a stop sign after entering it, Fields began to approach her. S.C. stated that she
    was in fear that Fields was going to try to enter her vehicle, and she drove away.
    S.C. would go on to say that a friend of hers had seen Fields outside of S.C.'s
    Burlington apartment the next night, October 18, watching the building.

d.  S.C. stated that when Fields drove by her house the last time, he stopped the Malibu
    and told her something to the effect of, "I love you, I forgive you," and drove off.

e.  S.C. stated that when she spoke with Ofc. Chun on October 9, 2025, Fields called
    a mutual acquaintance to tell them that he was in her parking lot watching her speak
    to police, hiding behind her vehicle. Fields provided details at this time of the
    officers that S.C. was speaking to S.C. stated that Fields took Snapchat videos and
    sent them to his friends on that night while he was in her parking lot.

14

f.  S.C. was asked about statements made by Fields in his TRO application to include allegations that she had assaulted him, allegations that ultimately resulted in her TRO being thrown out and his being granted against her. S.C. stated that she never assaulted Fields but admitted that she had invited him over to her house for sex because she knew it was the only way he would show up to her home. Her intent at that time was to break up with him owing to his infidelity. S.C. admitted that she had pushed Fields away from her but stated that she had done so because he had forced her into her bedroom and forced her onto her bed multiple times.

g.  Regarding the events of October 7, 2025, S.C. stated that she had been in fear of being assaulted by Fields when he pushed her into her bedroom after arriving at her apartment. S.C. stated that Fields shoved her into her bedroom and forced her onto her bed despite her attempting to stand up each time he pushed her. S.C. stated that she feared Fields would sexually assault her, and that he had never been that aggressive with her before in the two and a half years they had been involved in a romantic relationship.

h.  S.C. further stated that she knew Fields to always carry a knife on his person, and that the night of October 7, 2025, was no different. S.C. admitted to patting down Fields' pockets in an attempt to get the knife away from him. S.C. further stated she was in fear of being sexually assaulted because, prior to his arrival at her apartment, she learned that he had been accused of sexually assaulting other women in the past.

i.  During their conversation, Det. Beal asked S.C. how tall she was and how much she weighed and, similarly, how tall Fields was and how much he weighed. S.C.

informed him that she was approximately 5'2" and 90lbs, while Fields was approximately 5'10" and 165lbs.

j.  S.C. stated that it was only when she made a loud and audible sound to alert her roommates that she was in distress and needed help did Fields stop pushing her to the bed in an attempt to have intercourse with her.

k.  S.C. recalled that there were "a lot" of times when she had been in fear of Fields when they had fought during the course of their relationship. S.C. stated that she was aware Fields had been physically violent during past relationship, and knew he had "beat a guy so badly" the victim had sustained a broken arm and a concussion. S.C. further stated that she had seen Fields get violent with an older man who was walking a dog.

l.  S.C. stated that Fields had told other individuals he had "hacked" her phone when she was at his family home in Georgia in June 2024. This is corroborated by the screenshots sent to Ofc. Chun by S.C. showing that the AudioFetch application was installed on her device June 17, 2024.

m.  S.C. stated that on October 7, 2025, before Fields left her home, she told him not to contact her and blocked his number. He then proceeded to contact her from a new number, which she was able to positively identify as belonging to him based on the fact that after she did not answer the call from the unknown number a voicemail was left stating something to the effect of, "Hi S.C., its Brandon." S.C. recognized the voice as Fields'.

n.  S.C. stated that in conversation with M.S., Fields' roommate, Fields was "frustrated" because he could not talk to her or see what she was doing.

o.  S.C. stated that the last time she saw Fields was on October 17, 2025 when he was outside her workplace.

p.  S.C. told Det. Cpl. Moyer and Det Beal that she had been made aware on the date of our conversation that Fields had a "script" of what his "brother" was supposed to say after calling her place of employment. This "script" had specific language that Fields wanted the caller to use. S.C. sent me a copy/paste of the "script," which she received from a friend named V.G. who had in turn received it from Fields:

     i.  She bartends at a restaurant called [name of restaurant] in winooski tomorrow night. Opens at 4. Call closer to 4 before it gets too busy for her to talk

     ii.  Call in and ask for her, say youre from some made up legal entity or victims advocate shit and say its urgent, and she really needs to hear it. Can make up a fake name. Be extremely polite and act like you are concerned and want to help

     iii.  Tell her that this is an extremely urgent snd private matter and to step away from coworkers so no one can hear

     iv.  Say that you wanted to call before the office closes and that you wanted to let her know that I am planning on pressing charges on Monday

     v.  Tell her that I would be pressing her and possibly her roommates for harrassment, physical assault, false imprisonment, entrapment, and perjuring the court by telling a false story of the events

     vi.  Say that with that video as evidence she's in a bad spot and will likely be charged, and that the penalties can be pretty rough

     vii.  Also say that if it gets to Title 9 at UVM she could be suspended or expelled

     viii.  Emphasize the fact that you want to help her and she MUST do what you tell her. Really hammer down on that point before the big reveal. The fact that i will move forward with the charges and she needs to listen to you

     ix.  When it is clear to her, make the big reveal -- that her best bet is to go talk to me that night

17

        x.    Mention that youre aware that I have a restraining order on her and that I have no intention of jamming her up, and that I never wanted it

q.  S.C. stated that her understanding was that the above copied "script" was phase one of Fields' plan. Phase 2 was to send someone into the restaurant close to closing to make similar statements, while Phase 3 was for Fields to by lying in wait in her vehicle with a knife and/or a firearm. S.C. stated that Fields knew her vehicle and the code to enter it without a key, and further that she always parked in the exact same spot when she was at work.

r.  When asked to rate her fear on a scale of 1-10, with 10 being the most fear she had ever been in, in regards to whether or not she was scared Fields would enact his "plan," S.C. stated her fear was a 10/10, stating that she was fully in fear that he would carry out the plan and that he would use a weapon on her. She further stated her fear level was a 10/10 that Fields would hold a knife to her and a gun to her head if he entered her vehicle and waited for her, and that while she did not think he would kill her she believed wholeheartedly that he would use the knife to hurt her to prove a point. S.C. stated that she did not know what Fields would do to her if she did not speak with him or get back together with him.

s.  S.C. clarified the timeline of events at the tail end of their conversation:

        i.    October 7: [S.C.] broke up with Fields and told him repeatedly not to contact her, further blocking his number. Soon after he left her apartment, Fields contacted her using a new phone number.

        ii.   October 9: [S.C.] met with Ofc. Chun and Cpl. Congdon while Fields watched from her parking lot. [S.C.] received texts from Fields about her interactions with law enforcement, and earlier in the day he continued texting her from the new number despite her repeated

statements telling him to stop contacting her. Fields responded by threatening [S.C.] with legal action.

    iii.   October 14: Fields applied for a TRO in response to [S.C.] receiving a TRO against him.

    iv.   October 16: [S.C.] and Fields had both of their TROs heard by a Judge, who granted Fields' but threw out [S.C.'s]. [S.C.] indicated that Fields lied under oath during the hearing, and was able to explain satisfactorily to Det. Cpl. Moyer and Det Beal the events of October 7, 2025 that Fields had evidently weaponized against her.

    v.   October 17: [S.C.] found Fields waiting for her outside her place of employment in Winooski, VT. Fields followed [S.C.] to her vehicle, and approached her at a stop sign in such a way to suggest that he was going to enter her vehicle against her will.

    vi.   October 18: [S.C.] was made aware by a friend that Fields was watching her Burlington apartment from the side of the road.

    vii.   October 23: [S.C.] was contacted by [M.S.] about the video recordings of Fields inside their 6C Chase Lane, Burlington apartment wherein he was recorded trying to solicit assistance from others to ultimately lay in wait for [S.C.] in her vehicle with a knife and/or a firearm.

    viii.   October 24: [S.C.] received Fields' "script" from [V.G.].

18.    It should be noted that a Vermont State final relief from abuse order was granted on October 16, 2025, during a hearing in which both FIELDS and [S.C.] were present. This order was issued by the Hon. Judge Gallagher, and is in effect through October 16, 2026, and ordered that [S.C.]:

    a.  *Refrain from abusing Fields and interfering with his personal liberty;*

    b.  *Not use, attempt to use or threaten to use physical force that would reasonably be expected to cause bodily injury against Fields;*

    c.  *Not do anything that would place Fields in reasonable fear of bodily injury;*

    d.  *Not follow or stalk Fields;*

    e.  *Not threaten Fields;*

     *f.  Not contact Fields in any way, whether directly, indirectly, or through a third party, with the purpose of making contact with Fields, including in writing or by telephone, email, or other electronic communication.*

19.    FIELDS is suspected to only be in Vermont as a student at the University of Vermont. However, his status as a student is in question, with S.C. indicating that he was recently taken off of suspension due to allegations and investigations into misconduct. Fields' roommates have indicated that he remains at home most of the time and are unaware if he is actively enrolled in classes. They have stated that if FIELDS is so enrolled, "it is likely on a very light course workload."

## Search Warrant

20.    On October 24, 2025, the Burlington Police Department executed a Vermont State search warrant on the residence of FIELDS at 6 Chase Lane #C in Burlington, Vermont. Number 6 Chase Lane #C in Burlington, Vermont, describes FIELDS's personal bedroom, which was located within 6 Chase Lane and which was identified as belonging to FIELDS and FIELDS alone. The allegations described above supported the search warrant.

21.    After arresting FIELDS outside his residence, law enforcement identified and secured FIELDS's bedroom. Finding the bedroom locked and being informed that FIELDS kept the only keys to the bedroom, law enforcement breached the bedroom door, verified that no individuals were inside during a safety sweep, and secured the bedroom. Ofc. Philbrik and Ofc. Gonzalez of the BPD ensured that no one else entered the bedroom or tampered with evidence as another member of law enforcement applied for a search warrant.

22.    During the course of the search warrant execution, a safe lockbox disguised as a book titled *The Decline and Fall of the Roman Empire* was located by Ofc. Gonzalez. This lockbox was opened and Ofc. Gonzalez and Det. Wrinn located a large amount of U.S. currency, a large quantity of small glassine/ziplock style bags, and two separate ziplock bags containing a white

20

rocklike substance consistent with "crack" cocaine. There was also a red plastic container within the lockbox. On October 27, 2025, Det. Beal conducted a further review of the contents of this lock box. Det. Beal noted the following:

    *a.    The total amount of suspected "crack" cocaine contained within FIELDS' lockbox was approximately 13.2g including packaging. Det Beal tested both white rocklike substances, and both substances field tested presumptive positive for the presence of cocaine.*

    *b.    The lockbox was identified as containing $700 worth of US currency:*

        *i.    2x $100 bills*

        *ii.    25x $25 bills*

    *c.    The red plastic container was identified as housing a digital scale bearing significant white powdery residue on its surface and cover. This residue tested presumptive positive for the presence of cocaine.*

    23.    In my training and experience, the presence of glassine bags plus a scale is indicative of drug distribution. This is further reinforced by the presence of approximately $700 in U.S. currency which is likely drug proceeds, and the suspected "crack" cocaine itself.

### Interview of V.G.

    24.    On October 28, 2025, Det. Beal called V.G., who had previously provided S.C. with the script of what was to transpire. V.G. provided Det Beal a sworn statement over the phone. This is not an entire recounting of the statement, only a relevant piece. V.G. told Det Beal the following:

    *a.    [V.G.] stated that he was aware that Fields had a history of drug and alcohol use, stating that he remembered conversations where Fields would recount being in trouble with law enforcement when he was younger and that he stated he had completed a stint in rehab. He further*

*recounted that, more recently, [S.C.] had told him that Fields was using and selling drugs. [V.G.]*
*stated that, within the past year, his understanding was that Fields was using and selling cocaine*
*based on those conversations with [S.C.].*

### Follow up interview of S.C.

25.    On October 28, 2025, Det. Beal and Det. Moyer met again with S.C. to conduct a
follow-up interview at a known location in Burlington, VT.  This interview was captured on Det.
Beal's Axon body camera as well as an audio recorder.  S.C. provided a sworn statement at this
time.  This is not an entire or verbatim recounting of S.C.'s statement on this date, only those
relevant pieces.  S.C. stated the following:

    a.  S.C. admitted that she knew FIELDS to have engaged in the sale and distribution of
        "crack" cocaine in the Burlington area.

    b.  S.C. stated that C.Y. (with a known date of birth) was a cook for FIELDS and had
        cooked cocaine into "crack" for him historically.

    c.  S.C. also stated that FIELDS's court-ordered responsible adult appointed as part of his
        Vermont State criminal charges for stalking, Christopher J. Reed (DOB 4/9/1966), was
        also a cook for FIELDS, historically cooking cocaine into "crack" for him.

    d.  S.C. stated FIELDS first began selling cocaine in the Burlington area during 2023
        between the months of October to December. FIELDS initially had a "plug," or source
        of the drug, who would give him 10 grams of product at a time to sell.

    e.  FIELDS would orchestrate drug deals using his personal cell phone, switching over to
        use the "Signal" end-to-end encrypted application after his initial sale successes.

    f.  S.C. stated that FIELDS would recently purchase an ounce of cocaine at a time, and
        that he would sell illegal narcotics out of S.C.'s apartment as well as his Chase Lane

address. S.C. stated that Fields would sell grams of cocaine for $80-$100 depending on whether he was selling to a friend or frequent customer. S.C. stated that FIELDS would sell typically an ounce of cocaine roughly over two weeks.

g.  S.C. stated that FIELDS would conceal the drugs he was selling in hides. As previously mentioned, it should be noted that the drugs seized by investigators were located in a fake book lockbox.

h.  S.C. stated that she believed FIELDS was going to pay one of his cooks, C.Y., with cocaine if he had helped FIELDS follow through on the plan he had concocted to ultimately lie in wait for her inside her vehicle with a weapon on October 24, 2025.

i.  S.C. showed Det. Beal photographs of what appeared to be illegal narcotics on her phone. S.C. admitted that FIELDS would use her Signal account as his secondary means of communication for fulfilling drug deals. S.C. advised that when FIELDS could not complete a drug deal, he would send customers to her to complete the deal.

**Video from 6 Chase Lane**

26.    On October 29, 2025, Det. Beal received a new video from M.S. at 6 Chase Lane in Burlington, VT. M.S. previously advised there was a common area Blink camera that all tenants were made aware of at the time of their lease signing, which had been placed inside the apartment after previous roommate issues. The name of the file indicated that it had been recorded at approximately 17:56 hours on October 27, 2025, shortly after FIELDS was released to the custody of his responsible adult, Christopher J. Reed, from court after being arraigned on Vermont State felony cocaine possession charges.

27.    The video contained audio, with Reed beginning by asking if FIELDS had made "use of the toilet." When FIELDS asked, "What?" in response, Reed asked FIELDS, "Did you

flush it?" FIELDS responded affirmatively, and Reed told someone on the other end of a phone call that it was "done."

28.    Reed after hanging up the phone, said to FIELDS, "You just… flushed it." He then held his hand out to FIELDS and said, "There you go." FIELDS placed something into Reed's hand in an apparent handoff.  Reed then told FIELDS, "Do not look at me like that. This is your doing, and I warned you about it. Fuck. I told your dad you… you just heard, he said, 'Did you make good use of it? Did you flush it?'… you said yes, so as far as I'm concerned you flushed it." This indicates that FIELDS returned to Chase Lane to recover left behind drug evidence.  It appears as if FIELDS likely provided this left behind evidence to Reed

### Conclusion

27.    Based on the information set forth above, I believe there is probable cause that on October 24, 2025, in the District of Vermont, Brandon FIELDS violated 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) by knowingly and intentionally possessing with intent to distribute a mixture and substance containing cocaine base and, in or about October 2025, in the District of Vermont, FIELDS violated 21 U.S.C. § 2261A(2)(B) and by cyberstalking – that is, with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, using a facility of interstate commerce to engage in a course of conduct causing, attempting to cause, or reasonably expected to cause substantial emotional distress to that person.

Dated at Burlington, in the District of Vermont, this 29 day of October, 2025.

_____
Durwin Ellerman
Task Force Officer, DEA

Subscribed and sworn before me this this **29** day of October, 2025.

_____
Hon. Kevin J. Doyle
United States Magistrate Judge